UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PANORAMIC STOCK IMAGES, LTD. d/b/a/ ) | |
| PANORAMIC IMAGES, ) | |
| ) | 12 C 10003 |
| Plaintiff, ) | |
| ) | Judge Feinerman |
| vs. ) | |
| ) | |
| JOHN WILEY & SONS, INC., ) | |
| ) | |
| Defendant. ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Panoramic Stock Images, Ltd., brought this suit against John Wiley & Sons, Inc., alleging

direct and contributory infringement under the Copyright Act, 17 U.S.C. § 501 *et seq.*, and

common law fraud. Doc. 1. The court denied Wiley's partial motion to dismiss under Federal

Rule of Civil Procedure 12(b)(6). Docs. 38-39 (reported at 963 F. Supp. 2d 842 (N.D. Ill.

2013)). Now before the court is Wiley's motion for partial summary judgment on Panoramic's

fraud and contributory infringement claims and on Panoramic's recovery for any infringements

occurring before December 17, 2009. Doc. 59. Also before the court is Panoramic's motion for

partial summary judgment on liability for infringement and on Wiley's affirmative defenses.

Doc. 65. Wiley's motion is denied, and Panoramic's motion is granted in part and denied in part.

The case will proceed to a jury trial on November 17, 2014. Doc. 70.

**Background**

The general background of this case is set forth in the opinion denying Wiley's motion to

dismiss, 963 F. Supp. 2d at 843-46, familiarity with which is assumed. When considering

Wiley's summary judgment motion, the facts are considered in the light most favorable to

Panoramic, and when considering Panoramic's motion, the facts are considered in the light most

favorable to Wiley. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). The court will disregard the portions of Wiley's Local Rule 56.1(b)(3)(B) response that fail to cite specific record material or that present argument inappropriate for a Local Rule 56.1 submission (*e.g.*, Doc. 82 at ¶¶ 8, 13). *See* N.D. Ill. L.R. 56.1(b)(3)(B) (requiring the non-movant to file "(3) a concise response to the movant's statement that shall contain: ... (B) a response to each numbered paragraph in the moving party's statement, *including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon"*) (emphasis added); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial. Citations to an entire transcript or to a lengthy exhibit are not specific and are, accordingly, inappropriate."); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 739 F. Supp. 2d 1063, 1068 (N.D. Ill. 2010) ("the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses") (citation omitted).

Panoramic is a stock photography agency that licenses to publishers, including Wiley, photographs that independent photographers have authorized Panoramic to market. Doc. 84-1 at ¶ 2; Doc. 82 at ¶ 1. Panoramic claims to own the copyrights in the photographs at issue here ("Panoramic photographs") by virtue of agreements with those photographers. Doc. 84-1 at ¶ 3.

Wiley is a publisher of educational textbooks and professional or trade books, which it sells throughout the United States and overseas. *Id*. at ¶ 1; Doc. 82 at ¶ 2.

From time to time between 1998 and 2010, Wiley paid stock photo permission invoices issued by Panoramic or its agent Getty Images in connection with Wiley's use in its publications of the Panoramic photographs. Doc. 84-1 at ¶ 6; Doc. 82 at ¶ 7. When Wiley wished to license a photograph directly from Panoramic, a Wiley photo editor informed Panoramic of Wiley's interest in using the photograph in a certain publication, often with an estimated usage or print run, and asked Panoramic to issue an invoice. Doc. 84-1 at ¶¶ 8-9; Doc. 82 at ¶ 8. When Wiley included a print run in a permission request, the Wiley photo editor would attempt to clear permissions for the full life of the publication, but the photo editor generally did not review prior edition print run information or forecasting documents, and instead sought permissions for an estimated usage or print run pursuant to an acquisitions editor's instructions. Doc. 84-1 at ¶¶ 9-10; Doc. 82 at ¶ 8. Terms and conditions set forth on the invoices limited the authorized print quantities, the geographic distribution for the publications, and the type of media in which the photographs could be reproduced. Doc. 82 at ¶ 8. This process was standard for the duration of Wiley's relationship with Panoramic. Doc. 84-1 at ¶ 7.

Parties to a licensing transaction in an ongoing licensing relationship—such as Wiley's relationship with Panoramic and Getty—customarily did not consider extended uses of a stock photograph to be an infringement. Doc. 82 at ¶ 8. Rather, publisher-agency licensing was a multistep process, beginning with an initial request from the publisher and continuing with multiple communications, agreements, purchase orders, billing requests, invoices, and license additions or relicensing requests, all of which together constituted the licensing history of a photograph in a publication. *Ibid*. Such ongoing, mutually beneficial relationships between

publishers like Wiley and photo agencies like Getty and Panoramic were common, and because so many projects were ongoing and coincident with other projects, it was not unusual for time to elapse before the parties determined that additional licensing was required. *Ibid*. Thus, licensing transactions encompassed not just the invoice, but also the parties' course of dealings, negotiations, correspondence, and invoice requests. *Ibid*.

At some point before November 12, 2009, Douglas Segal, Panoramic's president, read a magazine article "about unauthorized use of stock agencies' photographs by publishers," which described stock agency litigation against certain publishers and the involvement of Harmon & Seidman, a law firm, in that litigation. Doc. 84-1 at ¶ 29. At the time, Panoramic was unaware of any specific titles, publications, or publishers that were allegedly infringing its copyrights. *Id*. at ¶¶ 29-30. On November 12, 2009, Christopher Seidman of Harmon & Seidman emailed Segal to thank him for "contacting [Harmon & Seidman] to discuss the status of litigation by visual art licensors against textbook publishers" and to "welcome [Panoramic] as a client." *Id*. at ¶ 30. The email noted the pair's discussion of "systemic copyright infringement" by textbook publishers, and asked Segal to prepare spreadsheets reflecting Panoramic's invoices to Wiley and other textbook publishers. *Ibid*. Seidman said that Segal should review Panoramic's invoices "[g]oing back to 1995" because that time frame "will capture most infringing activity." *Ibid*. The email attached a proposed retainer and contingency fee agreement. *Ibid*. Segal testified that after the call with and email from Seidman, he did not suspect that Wiley had infringed any of Panoramic's copyrights, and he did not receive any information after the call or email identifying any infringing publications. *Id*. at ¶¶ 29-30. Segal testified that Panoramic first became aware of potential issues with Wiley's use of Panoramic photographs when he received an email from former Wiley employee Richard Fox on October 15, 2012. *Id*. at ¶ 29.

Panoramic filed this suit on December 17, 2012, alleging that Wiley infringed its copyrights on twenty photographs. Doc. 1-1; Doc. 84-1 at ¶ 12. Panoramic has withdrawn its claims as to eleven of those photographs. Doc. 84-1 at ¶ 13. Wiley used the remaining nine photographs in six titles: (1) *Healing Journey*; (2) *Physical Geography: The Science and Systems of the Human Environment*, 2d Edition ("*Science 2/e*"); (3) *A Global History of Architecture* ("*Architecture 1/e*"); (4) *Hawaii with Kids*, 3d Edition ("*Hawaii 3/e*"); (5) *Caribbean Ports of Call*, 8th Edition ("*Caribbean 8/e*"); and (6) *Barbarians of Wealth: Protecting Yourself from Today's Financial Attilas* ("*Barbarians*"). *Id*. at ¶ 14. The nine photographs are:

1. "USA, Michigan, Glen Lake, Sleeping Bear Dunes," by James Schwabel, Registration No. VA 841-131 ("Schwabel Photograph"), used in *Science 2/e*;

2. "USA, Utah, Canyonlands National Park," by Warren Marr, Registration No. VA1-002-221 ("Marr Photograph"), used in *Science 2/e*;

3. "Lavender Haute Provence France," by D. Barnes/ImageState, Registration No. VA 957-800 ("Barnes Photograph"), used in *Science 2/e*;

4. "Storm, Canyonlands National Park, Utah, USA," by James Cowlin, Registration No. VA 1-002-221 ("Cowlin Photograph"), used in *Science 2/e*;

5. "USA, West Virginia, Elk Mountain, Mountain Bikers," by Skip Brown, Registration No. VA 1-002-221 ("Brown Photograph"), used in *Science 2/e*;

6. "Old Ruins of a Palace, Villa Jovis, Capri, Naples, Campania, Italy," by Walter Bibikow, Registration No. 1-832-089 ("Bibikow Photograph"), used in *Architecture 1/e*;

7. "Buildings at the Waterfront, Willemstad, Curacao, Netherlands Antilles," by Tom Sheckels, Registration No. [pending as of December 2012] ("Sheckels Photograph"), used in *Caribbean 8/e*;

8. "USA, Hawaii, Kona Coast," by Allen Prier, Registration No. VA 841-131 ("Prier Photograph"), used in *Hawaii 3/e*;

9. "Close-up of Assorted Gold and Silver Coins, Sacramento, California, USA," by Bruce McNitt, Registration No. VAu 440-862 ("McNitt Photograph"), used in *Barbarians*.

*Id*. at ¶¶ 13-15; Doc. 82 at ¶ 9; Doc. 62 at ¶ 3; Doc. 65-4; Doc. 1-1.

Panoramic registered six of the nine photographs with the United States Copyright Office as part of group or compilation registrations: the Schwabel and Prier Photographs are part of compilation VA 841-131; the Barnes Photograph is part of compilation VA 957-800; and the Marr, Cowlin, and Brown Photographs are part of compilation VA 1-002-221. Doc. 82 at ¶ 5; Doc. 65-4. The compilation registrations do not identify the author of each photograph included in the compilation; rather, in the "name of author" section, the registrations identify only some of the photographers and then indicate "and 125 others," or "and 104 others," or "21 others." Doc. 82 at ¶ 5. The compilation registrations do not identify by name any of the photographers of the Panoramic photographs. *Ibid*.

For its direct copyright infringement claim, Panoramic alleges that Wiley violated the terms of the invoices issued by Panoramic or Getty by printing more copies of a listed title than was listed in the invoice, by distributing copies outside the geographic territories listed in the invoice, and by reproducing the images in electronic formats not permitted by the invoice. Doc. 84-1 at ¶ 16. It is undisputed that for *Science* 2/e, *Architecture* 1/e, and *Barbarians*, Wiley exceeded the print quantity specified on the relevant invoices. Doc. 82 at ¶ 12. *Science* 2/e was first published on August 23, 2001, and all printings and sales were completed prior to May 2007. Doc. 90-1 at ¶ 15. 8,666 copies of *Science* 2/e were distributed outside North America; some contained the Panoramic photographs, while others did not. Doc. 82 at ¶ 13. The photographs in *Science* 2/e may also have been used in unlicensed electronic formats or editions. *Id*. at ¶¶ 13-14. *Architecture* 1/e was published on August 7, 2006, and the last printing occurred in November 2007. Doc. 90-1 at ¶ 16; Doc. 82 at ¶ 12. Wiley sold a certain number (the precise figure is under seal) of copies of that book after May 2009. Doc. 90-1 at ¶ 16; Doc. 82 at ¶ 12.

*Hawaii* 3/e was published on February 6, 2009, and all copies were printed at that time. Doc. 90-1 at ¶ 17. Wiley concedes infringement liability as to any electronic distribution of *Architecture* 1/e and *Hawaii* 3/e after December 17, 2009. Doc. 82 at ¶ 14.

*Barbarians* was published on November 19, 2010, and the invoice from Getty allowed for "Print Run/Circulation: Up to 10,000" and stated that usage of the McNitt Photograph on the cover included "electronic" formats and that "electronic distribution rights" were included. Doc. 90-1 at ¶ 18. Wiley printed more than 10,000 copies of *Barbarians*, but sold fewer than 10,000 copies. Doc. 82 at ¶ 12. In 2010, under their pricing agreement, Getty charged Wiley $750 to use a photograph on a book's cover, and that price contemplated use for a print run of up to 200,000 copies, including electronic usage. *Ibid.*; Doc. 90-1 at ¶ 18. The Getty Images' Master License Agreement entered into by Getty and Wiley, effective June 30, 2010, states that the terms of the invoice govern Wiley's use of Getty's images and that use beyond those terms "constitutes copyright infringement." Doc. 90-1 at ¶ 18.

For its contributory copyright infringement claim, Panoramic alleges that Wiley distributed the Panoramic photographs to third parties, who then "translated the publication at issue into additional languages or published them in local adaptations or reprints and included the Photographs … without Panoramic's permission." Doc. 84-1 at ¶ 18. Wiley's standard form license agreement with third parties for translating its publications explicitly provides that no rights to use third-party content in the publication is granted by virtue of an agreement authorizing the translation, and there is no evidence that any of the Panoramic photographs were printed in any third party's translation of any of the above-referenced six titles. *Id.* at ¶¶ 20-21. Wilhelm Zerter, Wiley's Vice President of Finance and Operations for Global Education, testified that Wiley ships United States publications to its foreign subsidiaries to sell

internationally.  Doc. 87 at ¶ 31.  There is evidence that Wiley's foreign subsidiaries distributed

and sold Wiley textbooks (including *Science* 2/e) outside of the permitted geographic areas.

*Ibid*.  Deborah Stailey, Wiley's Director of Composition Services, testified that Wiley provided

Amazon, a third party, with electronic PDFs of its textbooks to be used in creating eBook

versions of Wiley's publications.  *Id*. at ¶ 32.  Amazon reproduced at least one of the above-

referenced titles in the form of an eBook.  *Ibid*.

 Panoramic's fraud claims concern four of the Panoramic photographs, each appearing in

*Science* 2/e.  Doc. 84-1 at ¶ 22.  Panoramic alleges that Wiley intentionally misrepresented its

intended use of the images—whether through print run numbers, geographic distribution, or

format—in order to obtain a lower license fee from Panoramic.  *Ibid*.  Panoramic further alleges

that it relied on Wiley's implicit representations that it would not exceed the parameters in its

invoice request letters and that, as a result, Panoramic "charg[ed] [Wiley] a lower fee" than it

otherwise would have charged.  *Ibid*.  To support its fraud claim, Panoramic references a July

2001 invoice request letter sent to Panoramic by Jennifer MacMillan of Wiley, which requests

that Panoramic "bill [Wiley] for North American publication rights for [*Science* 2/e] with print

runs totaling under 15,000 copies" for six listed photographs, including the four at issue here.  *Id*.

at ¶ 23.  Wiley had printed over 47,000 copies of the prior edition of *Science* 2/e and distributed

them internationally, and Wiley's internal forecasting documents indicated that it expected to

print 31,000 copies of *Science* 2/e and to distribute them internationally.  *Id*. at ¶ 25.  Panoramic

did not seek to depose MacMillan, who is no longer employed by Wiley, and Wiley's last known

address for MacMillan indicates that she resides in New York.  *Id*. at ¶¶ 24-27.

**Discussion**

**I.      Wiley's Motion for Partial Summary Judgment**

**A.      Panoramic's Fraud Claim**

"Under Illinois law … the elements of common law fraud are: (1) a false statement of

material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce

action by another in reliance on the statement; (4) action by the other in reliance on the

truthfulness of the statement; and (5) injury to the other resulting from that reliance." *Athey*

*Prods. Corp. v. Harris Bank Roselle,* 89 F.3d 430, 434 (7th Cir. 1996); *see also Connick v.*

*Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996).  Wiley argues that Panoramic cannot

establish the third and fifth elements.  Although Wiley may prevail at trial, there is sufficient

evidence in the record to allow a reasonable jury to find for Panoramic on those two elements.

With respect to the third element, Wiley contends that "Panoramic cannot show that

Wiley made an *intentional, affirmative* misrepresentation to Panoramic about the book in

question."  Doc. 61 at 6.  Specifically, Wiley submits that the "[o]nly … document contain[ing]

any sort of representation to Panoramic at all" is the July 10, 2001 invoice request letter that

MacMillan (Wiley's photo editor) sent to Panoramic requesting "North American publication

rights for [*Science* 2/e] with print runs totaling under 15,000 copies," and that "[t]here is no

indication that, at the time the letter was sent, Ms. MacMillan (or anyone else in the photo

department …), was aware of any plan by Wiley to print more than 15,000 copies of *Science* 2/e,

or to distribute the book outside North America."  *Id*. at 15.  According to Wiley, because

MacMillan has not yet been deposed and now lives out-of-state, Panoramic cannot "demonstrate

either that Wiley affirmatively and materially misled Panoramic, or that, if Wiley did, it intended

to do so."  *Id*. at 15.

Panoramic correctly responds that "[a]dditional Wiley documents allow for the reasonable inference that Wiley, at the time of licensing, requested permission to make fewer copies than it planned to make or knew it could sell based on forecasting documents and prior edition sales." Doc. 84 at 3. The summary judgment record includes evidence that Wiley had printed over 47,000 copies of the prior edition of *Science* 2/e and distributed them internationally, that photo editors like MacMillan had access to a system that would show prior edition sales, and that Wiley's internal forecasting documents indicated that it expected to print 31,000 copies of *Science* 2/e and distribute them internationally. Doc. 84-1 at ¶¶ 9, 25. That evidence, in conjunction with MacMillan's invoice request estimating *Science* 2/e's print run at less than half the internal forecast, could allow a reasonable jury to find that Wiley's intent was fraudulent, regardless of whether MacMillan testifies at trial either in person or via deposition. *See Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007) ("As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.") (brackets omitted), *overruled on other grounds by McCarter v. Retirement Plan for Dist. Mgrs. of Am. Family Ins. Grp.*, 540 F.3d 649, 654 (7th Cir. 2008); *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986) ("[A]s a general principle, questions of motive and intent are particularly inappropriate for summary adjudication … [and] resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible.") (internal quotation marks and citations omitted); *Alan Drey Co., Inc. v. Generation, Inc.*, 317 N.E.2d 673, 679 (Ill. App. 1974) ("The question of fraudulent intent … is a question of fact …. Direct evidence [of fraudulent intent] is not essential, however, for said intent may be established by circumstances which indicate its existence."); *Cement-Lock v. Gas. Tech. Inst.*, 523 F. Supp. 2d 827, 858 (N.D. Ill. 2007) ("The fact-finder is permitted to infer an

intent to defraud from all of the circumstances.") (citing *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000)).  The court therefore rejects Wiley's first ground for summary judgment on the fraud claim.  *See Bean v. Pearson Educ., Inc.*, 949 F. Supp. 2d 941, 951-53 (D. Ariz. 2013) (Arizona law) (denying summary judgment on a fraud claim where the estimated print run in publisher's billing request was considerably lower than its internal forecasts and circulation of prior textbook editions); *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1250-51 (D. Colo. 2008) (Colorado law) (denying summary judgment on a fraud claim where a reasonable jury could find that the publisher "knew … that it would exceed both the numerical and geographical limitations stipulated in its [request] letters"); *cf. Frerck v. John Wiley & Sons, Inc.*, 2014 WL 3512991, at *8 (N.D. Ill. July 14, 2014) (granting summary judgment on a fraud claim where the plaintiff adduced no evidence that the Wiley photo editor had ready access to information regarding prior edition sales and no evidence of Wiley's forecasts).

With respect to the fifth element of the fraud claim, Wiley contends that Panoramic "cannot show that it suffered any *harm resulting from the misrepresentation* that is *independent and distinct from* the harm it attributes to the alleged copyright infringement." Doc. 61 at 6-7. In support, Wiley cites *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923 (7th Cir. 2003), where the plaintiff claimed that the defendant had obtained a disk containing his copyrighted computer program by falsely representing that it wanted only to evaluate the program for possible licensing, when in fact the defendant wanted to and did copy it.  *Id.* at 933.  The Seventh Circuit affirmed the dismissal of the fraud claim, reasoning that "[t]he compensatory damages that [the plaintiff] seeks for the fraud … are identical to the damages that it seeks for copyright infringement, so that its request for punitive damages is in fact a request for punitive damages for copyright infringement."  *Id.* at 934.

Panoramic correctly distinguishes *Bucklew* on the ground that "[b]efore any infringement occurred [in this case], Panoramic was deprived of the license fee that Wiley would have paid Panoramic had it been honest in its dealings with Panoramic," and that Panoramic thus "was damaged at the time of licensing even without Wiley's later infringing activity." Doc. 84 at 5. Although Wiley submits that Panoramic's assertion lacks evidentiary support, Doc. 86 at 8, the summary judgment record would permit a reasonable jury to find that Panoramic's issuance of an invoice triggered Wiley's payment, and thus that Wiley's alleged fraud caused Panoramic harm at the time of licensing that is separate and distinct from any harm arising from the later infringement. *See Wood*, 589 F. Supp. 2d at 1252 ("If a copyright defendant [made a false representation of material fact knowing it to be false, and intending that it be relied upon], it most certainly could have caused harm separate from the harm of infringement itself, because it could have deprived the copyright holder of substantial licensing fees paid up front, rather than significantly delayed and only received—if ever—through litigation. In other words, if the harm from infringement is the amount the copyright holder would collect from the number of copies the publisher reproduced in excess of the scope of the license, the harm from fraud would be the lost opportunity to the copyright holder from having its rightful licensing fee up front and in the absence of litigation, as well as the significant risk that the infringement might never have been discovered."). It follows that Panoramic has adduced sufficient evidence to satisfy the fifth element of its fraud claim.

### B. Panoramic's Contributory Infringement Claim

A contributory infringement plaintiff must show that the defendant engaged in "personal conduct that encourage[d] or assist[ed] the [direct] infringement [by a third party]." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757 (7th Cir. 2012) (internal quotation marks omitted).

Wiley argues that Panoramic's contributory infringement claim fails as a matter of law because "Panoramic has not sought or produced any evidence demonstrating any direct infringement by a third party." Doc. 61 at 7. Panoramic responds that the summary judgment record would allow a reasonable jury to find that "Wiley's subsidiaries distributed and sold Wiley textbooks containing Panoramic's photographs outside of the permitted geographic areas," and also that Wiley provided Amazon with PDF versions of Wiley titles, including Panoramic photographs, knowing that Amazon would be creating an unlicensed eBook and that Amazon in fact reproduced those photographs in the eBook. Doc. 84 at 7-8. Wiley's reply brief fails to address Panoramic's argument regarding Amazon, thus forfeiting the point for purposes of the present motion; summary judgment is denied on the contributory infringement claim on this ground alone. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (brackets and internal quotation marks omitted).

That said, it bears mention that while Wiley does respond to Panoramic's arguments regarding Wiley's subsidiaries, Wiley's responses are without merit. First, Wiley contends that the contributory infringement claim regarding the subsidiaries was not presented in the complaint and may not be added through Panoramic's summary judgment papers. Doc. 86 at 12. However, the complaint specifically alleges under the heading "Contributory Copyright Infringement" that "Wiley reproduced and distributed the Photographs without Panoramic's permission to other entities, subsidiary companies, divisions, affiliates and/or third parties

('Third Parties')" and "permitted Third Parties to distribute Wiley's publications containing the Photographs in new territories." Doc. 1 at ¶¶ 23, 25. Second, Wiley contends that the contributory infringement claim regarding the subsidiaries should be dismissed because it is duplicative of the direct infringement claim against Wiley. Doc. 86 at 13. That is wrong, as Panoramic may pursue two theories of liability at trial, particularly given that the summary judgment record does not conclusively establish the relationship between Wiley and its subsidiaries, thereby leaving open the question whether direct or contributory infringement fits this case. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984) ("the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn") (internal quotation marks and citation omitted); *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 604 (7th Cir. 2001) (refusing to dismiss the plaintiff's unfair competition claim as duplicative of its unfair competition claim where the record permitted a "distinct, independent basis for [the] unfair competition claim"). The court will ensure at trial that if Panoramic prevails on its copyright claims, it will receive only one recovery for each injury. *See Duran v. Town of Cicero*, 653 F.3d 632, 639-43 (7th Cir. 2011). Third, Wiley argues that Panoramic cites only to evidence regarding *Science* 2/e and *Hawaii with Kids* 3/e when pressing its contributory infringement claim as it relates to the subsidiaries. Doc. 86 at 13. That is wrong, as Panoramic also cites to the deposition testimony of a Wiley Vice President that Wiley ships United States publications to its foreign subsidiaries to sell them internationally. Doc. 84 at 7 & n.31 (citing Doc. 84-9 at 3-4); Doc. 87 at ¶ 31. That testimony was not limited to *Science* 2/e and *Hawaii with Kids* 3/e.

## C.     Wiley's Statute of Limitations Defense

Section 507(b) of the Copyright Act states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Wiley argues that Panoramic's copyright claims are time-barred to the extent they arise from acts of infringement occurring before December 17, 2009, which is three years before this suit was filed. Doc. 61 at 7, 18-20. Wiley is incorrect.

Wiley contends that the limitations issue should be governed by the injury rule, which provides that a copyright claim accrues when the infringement occurs. *Id*. at 18 n.6; Doc. 81 at 10 n.4; Doc. 86 at 15 & n.6; Doc. 104. However, the Seventh Circuit has adopted the discovery rule, under which "the copyright statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights." *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004) (citing *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983)); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992-93 (7th Cir. 2002) ("Statutes of limitations are of course subject to equitable doctrines such as tolling, and the modern tendency is to toll until the plaintiff knew or by reasonable diligence should have known of both the injury and its governing cause."). Wiley suggests that the Supreme Court abrogated *Gaiman* in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014), which, in rejecting the proposition that laches can bar a copyright claim brought within the limitations period, said that "[a] copyright claim … arises or 'accrues' when an infringing act occurs." *Id*. at 1969 (brackets omitted). Standing alone, that sentence would abrogate *Gaiman*'s discovery rule, but the Supreme Court qualified its holding with this footnote: "Although we have not passed on the question, nine Courts of Appeals have adopted, as an alternative to the incident of injury rule, a 'discovery rule,' which starts the limitations period when the plaintiff discovers, or with due

diligence should have discovered, the injury that forms the basis for the claim." *Id*. at 1969 n.4 (internal quotation marks omitted). So, with the Seventh Circuit having held in *Gaiman* that the discovery rule applies, and with the Supreme Court explicitly not passing on the question, this court is bound by *Gaiman*. *See Frerck v. Pearson Educ., Inc.*, __ F. Supp. 2d __, 2014 WL 3906466, at *3 n.3 (N.D. Ill. Aug. 11, 2014); *Beasley v. John Wiley & Sons, Inc.*, __ F. Supp. 2d __, 2014 WL 3600519, at *6 n.5 (N.D. Ill. July 21, 2014); *Frerck*, 2014 WL 3512991, at *6 n.5.

Wiley next contends that Panoramic learned or should have learned of its claims by early November 2009, when Segal became "aware of news coverage of earlier photo copyright litigation by other photo agencies" and "discussed 'systemic copyright infringement' by textbook publishers including Wiley." Doc. 61 at 9, 19. Panoramic responds that "[t]here is *no evidence* that Panoramic had *actual* knowledge, more than three years before the Complaint was filed, that Wiley had infringed any of Panoramic's rights." Doc. 84 at 10. Viewing the record in the light most favorable to Panoramic, a reasonable jury could find that Panoramic did not learn and should not reasonably have learned in November 2009 that any specific publications or publishers were infringing its copyrights, and that it did not become "aware of potential issues with Wiley's uses of Panoramic's photographs [until Segal] … received an email from former Wiley employee Richard Fox on October 15, 2012." Doc. 84-1 at ¶¶ 29-30.

Wiley protests that Panoramic was on "inquiry notice" as of November 2009, when it "had knowledge that would have led reasonable people to investigate the possibility that their legal rights had been infringed." Doc. 86 at 17 (internal quotation marks omitted). But on the summary judgment record, there remains a genuine dispute as to whether Panoramic had any pertinent knowledge at all, as opposed to vague concerns or suspicions of infringement. "An abstract fear of wrong doing is not enough [to start the running of a statute of limitations]." *CSC*

*Holdings, Inc.*, 309 F.3d at 992; *see also Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994) ("[Courts] cannot apply statute of limitations law in a way that pressures litigants to file suits based merely on suspicions and fears. At least in the commercial setting at issue here, suspicion and fear are not sufficient predicates for launching a lawsuit, and to file an action with no other basis would offend norms articulated in rules like Federal Rule of Civil Procedure 11.") (internal quotation marks omitted). Because a reasonable jury could find that Panoramic did not learn and could not reasonably have learned of Wiley's alleged infringement until October 2012, the court cannot hold on summary judgment that any of Panoramic's copyright claims are time-barred.

## II.     Panoramic's Motion for Partial Summary Judgment

### A.     Whether Panoramic Owns Valid, Registered Copyrights in the Photographs

Panoramic seeks judgment on the issue of whether it owns valid, registered copyrights in the Panoramic photographs. Doc. 65 at 6. Wiley concedes the point as to the Bibikow, Sheckels, and McNitt Photographs, which are not registered as part of compilations. But Wiley contends, as it did in its motion to dismiss, that the other six photographs are part of three "group registrations that fail to meet the registration requirements." Doc. 81 at 7. Wiley's contention rests on the legal premise that compilation registrations are insufficient under § 411(a) of the Copyright Act—which states that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title," 17 U.S.C. § 411(a)—to permit the copyright holder to sue for infringement of the compilation's individual components.

This court addressed that question in its opinion denying Wiley's motion to dismiss and held, consistent with *Metropolitan Regional Information Systems, Inc. v. American Home Realty*

*Network, Inc.*, 722 F.3d 591, 598-600 (4th Cir. 2013), that where the copyright holder of a registered compilation owns the compilation's components, the registration suffices to permit the suit. 963 F. Supp. 2d at 851-52. The court acknowledged that district courts had split on that issue, reasoned that it was most prudent to follow the only appeals court decision (*Metropolitan Regional Information Systems*) on the subject, and invited Wiley "to renew its argument later in the case, particularly if one or more appeals courts depart from the view adopted by the Fourth Circuit." 963 F. Supp. 2d at 852. Since that time, one other appeals court has resolved the issue, and that court agreed with the Fourth Circuit that "collective work registrations [are] sufficient to permit an infringement action on behalf of component works, at least so long as the registrant owns the rights to the component works as well." *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 683 (9th Cir. 2014) (alteration in original) (internal quotation marks omitted). This court is persuaded by the reasoning of the Fourth and Ninth Circuits, and adds for good measure that the Seventh Circuit "generally requires quite solid justification" to create a circuit split and "do[es] not lightly conclude that [its] sister circuits are wrong." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 576 (7th Cir. 2008).

Wiley argues in the alternative that even if *Metropolitan Regional Information Systems* correctly states the law, Panoramic has not established that it actually owned the rights to the relevant component works in the compilations. Doc. 81 at 9 n.3. Panoramic does not address this argument in its reply brief, thereby forfeiting the point for purposes of summary judgment. *See Bonte*, 624 F.3d at 466; *Judge*, 612 F.3d at 557. Moreover, Panoramic's initial brief does not properly show that it owned rights in the relevant photographs. To support its submission that it does own rights in those six photographs, Panoramic cited to the raw record rather than to its Local Rule 56.1(a)(3) statement. Doc. 65 at 6 & n.20. Panoramic cannot establish its point in

this manner. *See Thorncreek Apartment III, LLC v. Village of Park Forest*, 970 F. Supp. 2d 828,

838-39 (N.D. Ill. 2013) (citing cases). And even if the court were to examine Panoramic's Local

Rule 56.1(a)(3) statement, which is the only appropriate vehicle to present facts on summary

judgment, *see ibid.*, the evidentiary material that Panoramic cites for the proposition that it "is

the legal and beneficial owner of copyrights to" the photographs does not support that

proposition. Doc. 65-2 at ¶ 5 & n.5 (citing Doc. 65-9 at ¶ 2). For these reasons, Panoramic has

not shown that it "owns the rights to the component works as well," *Alaska Stock*, 747 F.3d at

683, and it follows that Panoramic is not entitled to summary judgment on the question whether

it owns the rights to the Schwabel, Marr, Barnes, Cowlin, Brown, and Prier photographs.

### B. Whether Wiley Exceeded the Scope of the Licenses

Next, Panoramic seeks summary judgment on the question whether Wiley exceeded the

scope of the invoices and on whether those invoices defined the scope of the permitted print

quantities, geographic distribution, and media. Doc. 65 at 6-10. However, the record would

allow a reasonable jury to find that the parties had an implied agreement or understanding that

the limitations listed on Panoramic's invoices were not fixed and could be modified by the

parties' course of dealings, negotiations, or and/correspondence. Doc. 82 at ¶ 8.

Panoramic takes issue with the veracity of the averments cited by Wiley to support its

position, but a court ruling on a summary judgment motion "has one task and one task only: to

decide, based on the evidence of record, whether there is any material dispute of fact." *Kodish v.*

*Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010). In so doing, the court

"may not make credibility determinations, weigh the evidence, or decide which inferences to

draw from the facts." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). For the court to

conclude that Panoramic's invoices in fact encompassed the entire licensing agreement between

Panoramic and Wiley would require the court to disbelieve Wiley's averments as to the broader, more flexible nature of the licensing relationship. It is axiomatic that the court may not do those things on summary judgment. *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 175 (7th Cir. 2011); *Kodish*, 604 F.3d at 505; *Payne*, 337 F.3d at 771-72; *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988).

### C.    Wiley's Affirmative Defenses

Wiley asserts numerous affirmative defenses, Doc. 40 at pp. 4-7, and Panoramic seeks summary judgment on several of them, Doc. 65 at 10-15. In response, Wiley withdraws its affirmative defenses of lack of standing, impropriety of copyright assignments, estoppel, unclean hands, and § 201(c) of the Copyright Act. Doc. 81 at 16 n.8. This leaves Panoramic's challenge to the defenses of statute of limitations, implied license or course of dealing, invalidity and unenforceability, laches, "innocent intent," untimeliness of copyright registrations, failure to mitigate damages, and the doctrine that breach of a covenant in a non-exclusive copyright license sounds in contract, not copyright.

Wiley's statute of limitations, implied license/course of dealing, and invalidity/unenforceability defenses are addressed above. Because genuine issues of material fact remain as to when Panoramic had or reasonably should have had knowledge of Wiley's alleged infringements, whether Panoramic holds valid and enforceable copyrights for six of the nine Panoramic photographs, and whether the invoices constitute the complete licensing agreement between the parties, summary judgment in favor of either party is inappropriate on those defenses.

Panoramic next argues for summary judgment on Wiley's laches defense. Doc. 65 at 11. "[L]aches is a defense developed by courts of equity; its principal application was, and remains,

to claims of an equitable cast for which the Legislature has provided no fixed time limitation

….” *Petrella*, 134 S. Ct. at 1973.  The Supreme Court held earlier this year that laches cannot

justify the dismissal of copyright claims “brought within the three-year look-back period

prescribed by Congress.” *Id*. at 1972.  That said, the Court noted that “[s]hould [the plaintiff]

ultimately prevail on the merits, the District Court, in determining appropriate injunctive relief

and assessing profits, may take account of her delay in commencing suit” and “may or may not

… limit[] relief at the remedial stage.” *Id*. at 1978.  Under *Petrella*, the viability of Wiley’s

laches defense as a bar to liability necessarily depends on the determination of which claims, if

any, fall within the three-year statute of limitations.  Because that question cannot be resolved on

this record, the question whether Wiley’s laches defense bars liability on any of Panoramic’s

infringement claims cannot be resolved at this stage.

Panoramic also argues that Wiley’s defense based on “the doctrine holding that any claim

for breach of a covenant in a non-exclusive copyright license sounds in contract and not in

copyright” fails because “[t]he law is well-settled that use of a copyrighted work beyond what

has been licensed is copyright infringement [and] Wiley has not produced any evidence in

support of this defense.”  Doc. 65 at 14.  Wiley fails to respond to this contention, thereby

forfeiting that affirmative defense.  *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th

Cir. 2007) (“We agree with the district court’s determination that [the plaintiff] waived (forfeited

would be the better term) his discrimination claim by devoting only a skeletal argument in

response to [the defendant’s] motion for summary judgment.”), *aff’d on other grounds*, 553 U.S.

442 (2008); *Transamerica Fin. Servs., Inc. v. Sykes*, 171 F.3d 553, 555 (7th Cir. 1999) (“It is a

well-settled rule that a party opposing a summary judgment motion must inform the trial judge of

the reasons, legal or factual, why summary judgment should not be entered.”).

Panoramic next contends that Wiley's "innocent intent" defense fails because "intent or knowledge is not an element of infringement, and thus even an innocent infringer is liable for infringement," Doc. 65 at 14, and that Wiley has adduced no evidence to support its affirmative defenses based on the alleged untimeliness of Panoramic's copyright registrations or Panoramic's failure to mitigate damages, *id.* at 15. Wiley responds that these defenses "are relevant to the proper measure of any damages Panoramic ultimately might seek to recover." Doc. 81 at 16. Panoramic fails to address this response in its reply brief, thereby forfeiting the issue. *See Bonte*, 624 F.3d at 466; *Judge*, 612 F.3d at 557.

## Conclusion

For the foregoing reasons, Wiley's motion is denied, and Panoramic's motion is granted in part and denied in part. Panoramic is entitled to summary judgment as to its ownership of valid, registered copyrights in the Bibikow, Sheckels, and McNitt Photographs, and also as to Wiley's standing, impropriety of copyright assignments, estoppel, unclean hands, § 201(c), and contract/copyright affirmative defenses. The case will proceed to trial on all three claims (direct copyright infringement, contributory copyright infringement, and fraud) as to the nine Panoramic photographs, and Wiley may raise its surviving affirmative defenses.

September 2, 2014

_____
United States District Judge